**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Joshua B. Glatt (State Bar No. 354064)
Ryan B. Martin (State Bar No. 359876)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ndeckant@bursor.com
        jglatt@bursor.com
        rmartin@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADAM ALDRICH, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>RESIDENT HOME, LLC, ASHLEY GLOBAL RETAIL, LLC, and ASHLEY FURNITURE INDUSTRIES, LLC,<br><br>Defendants. | Case No.    5:25-cv-1791<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Adam Aldrich ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendants Resident Home, LLC, d/b/a Nectar; Ashley Global Retail, LLC; and Ashley Furniture Industries, LLC ("Defendants").

## NATURE OF THE ACTION

1.      This action seeks to recover damages and injunctive relief for Defendants' continuing failure to disclose to Plaintiff and similarly situated consumers that his, and certain substantially similar mattresses, sold under the brand name Nectar (the "Products" or "Mattresses") leak (or risk leaking) toxic fiberglass. As such, the Products carried a price premium on account of this design and manufacturing defect.

2.      The leaking fiberglass was discoverable only after purchase and use of the Mattresses.

3.      Fiberglass poses a serious safety risk to consumers.  Exposure can cause severe skin, eye, and respiratory irritation.  Moreover, because fiberglass spreads through the home extremely easily, even a small exposure in the home requires consumers to hire professionals to remove it.   The cost is substantial: often tens of thousands of dollars.

4.      Relevant to this action, Plaintiff and similarly situated consumers paid a price premium for their mattresses, as they would not have purchased the mattresses (or would have purchased them on substantially different terms) had they known about the defects from it and the risk to their health and safety.

5.       Accordingly, Plaintiff brings claims on behalf of himself and all similarly situated consumers for violations of (1) California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; (2) California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*; (3) California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; (4) Fraud; (5) Breach of Express Warranty; and (6) Unjust Enrichment.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PARTIES**

6.      Plaintiff Adam Aldrich is a resident of Corona, California, and a citizen of the State of California.  Plaintiff Aldrich purchased Defendants' Classic Nectar Queen sized mattress on March 7, 2022, from the Nectar website from his home in Corona, California.  A tag attached to his mattress read, in part, "Glass Fiber … 23%" was attached to the outer cover ("Outer Mattress Tag").  However, the Outer Mattress Tag failed to warn Plaintiff and similarly situated consumers that the mattress was likely to leak fiberglass through regular use of the mattress; indeed, any tear or removal of the outer cover risks exposing consumers and those in the home to fiberglass. That exposure may lead to serious injuries and expensive clean ups. Moreover, Plaintiff only had the opportunity to discovery the Outer Mattress Tag *after* his purchase and use of the Mattress.  Plaintiff Aldrich—like any reasonable consumer—believed he was purchasing a mattress that did not pose any risk to health and safety. Had Defendants disclosed on the packaging that his purchase risked exposing him to fiberglass through the regular use of the mattress, Plaintiff Aldrich would not have purchased the Product or would have paid less for it.

7.      Defendant Resident Home, LLC is a Delaware corporation with its headquarters in Jeffersonville, Indiana.  Defendant Resident Home, LLC manufactures, markets, and sells the Products, throughout California and the United States.  During the relevant period, Defendant Resident Home, LLC controlled the manufacture, design, testing, packaging, labeling, marketing, advertising, promotion, distribution, and sales of its Products.

8.      Defendant Ashley Global Retail, LLC is a Delaware corporation. Defendant Ashley Global Retail, LLC manufactures, markets, and sells the Products, throughout California and the United States.  During the relevant period, Defendant Ashley Global Retail, LLC controlled the manufacture, design, testing, packaging, labeling, marketing, advertising, promotion, distribution, and sales of its Products.

9. Defendant Ashley Furniture Industries, LLC is a Wisconsin corporation. Defendant Ashley Furniture Industries, LLC manufactures, markets, and sells the Products, throughout California and the United States. During the relevant period, Defendant Ashley Furniture Industries, LLC controlled the manufacture, design, testing, packaging, labeling, marketing, advertising, promotion, distribution, and sales of its Products.

10. Together, Defendants Resident Home, LLC, Ashley Global Retail, LLC, and Ashley Furniture Industries, LLC, were part and parcel in the production of the Products and putting the Products into the stream of commerce. Accordingly, Defendants jointly in causing the unlawful, unfair, and fraudulent acts alleged herein.

## JURISTICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because there are more than 100 Members of the Classes, the aggregate claims of all members of the proposed Classes exceed $5,000,000.00, exclusive of interest and costs, and at least one Member of the Classes is a citizen of a state different from one defendant.

12. This Court has personal jurisdiction over Defendants because Defendants conduct substantial business within California, including this District, and purposefully avail themselves to the benefits of this District by selling the Products in this District. Additionally, a substantial portion of the events giving rise to Plaintiff's claims occurred in this District.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events, omissions, and acts giving rise to the claims herein occurred in this District and Plaintiff resides in this District.

## FACTUAL ALLEGATIONS

### A. Fiberglass is a Toxic Irritant

14. In recent years, consumers have become particularly concerned about the inclusion of fiberglass in their mattresses or other bedding materials. Indeed, the

concern has grown so significant that California has enacted a ban, taking effect in 2027, prohibiting the use of fiberglass in mattresses.[1]

15.    When consumers come into contact with fiberglass, they often experience acute symptoms including intense itchiness all over their skin; difficulty breathing; irritation of the mouth, nose, and throat; and intense eye itchiness.

16.    Glass fibers that reach the lower part of a person's lungs significantly increase the chances of adverse health effects.  Even glass fibers become imbedded in the skin can require surgical intervention for removal.

17.    Other possible health effects include a rash that appears when fiberglass becomes embedded in the outer layer of the skin, exacerbated asthma or bronchitis, and temporary stomach irritation.

18.    When fiberglass is exposed to the open environment it can become airborne and cover the surfaces of a consumer's home.  Once airborne, fiberglass easily spreads through ventilation systems, such as an HVAC system, and is then subsequently dispersed throughout the consumer's entire home.

19.    The released, loose fiberglass, travel through the ventilation systems and by contact with residents living in the home becomes thoroughly and irremovably embedded in fabrics, woven, wicker, and other similar matrix items throughout the entirety of a consumer's home, including drapery, furniture, carpeting, and innumerable other items.

20.    Once the glass fibers are embedded into fabric like clothes, towels, bedding, couches, etc., it is virtually impossible to remove all the glass fibers. Consumers must hire professional cleaning services to decontaminate their home which can cost thousands to tens of thousands of dollars.  Experts recommend occupants vacate a home exposed to glass fibers until it is professionally cleaned.

---

[1] Aimee Dewing, *Gov. Newsom Signs Bill to Ban Fiberglass and Other Toxic Chemicals from Mattresses and Sofas*, EWG (Oct. 08, 2023), https://www.ewg.org/news-insights/news-release/2023/10/gov-newsom-signs-bill-ban-fiberglass-and-other-toxic-chemicals.

**B.    Defendants And Their Mattresses**

21.    Defendants are global eCommerce mattress and furniture manufacturers.  Defendants specialize in memory foam mattresses that ship in a box and are usually less expensive and cumbersome than purchasing a traditional mattress.

22.    Resident Home, LLC, prior to its acquisition by Ashley Global Retail, LLC and Ashley Furniture Industries, LLC "set out to start a sleep revolution.  [Its] goal was to create the most comfortable mattress at a reasonable price point.  The result was Nectar, North America's fasted-growing e-commerce brand in 2018."[2]

23.    Defendants sell four different mattress models under the brand name Nectar: the Nectar Classic, Nectar Premier, Nectar Luxe, and Nectar Ultra.  Each model suffered from the alleged deficiencies at different periods of time.  Discovery will reveal the true extent of affected Products and the time range in which they were affected.  At the time each Product was affected, they contained the same or substantially similar misrepresentations and omissions made by Defendants on the Products' labeling and marketing.



**Nectar Classic**
Value pick for comfort & support

$297+



**Nectar Premier**
More foam, more pressure relief

$467+



**Nectar Luxe**
Even more cooling & pressure relief

$849+



**Nectar Ultra**
Tri-zone ergonomic support

$1,104+

24.    The Nectar Classic is Defendants' most affordable option.  Each level up provides more support and increases the Products' thickness by about an inch. Defendants also offer the Mattresses in various sizes.

---

[2] RESIDENT, https://shop.residenthome.com/pages/about (last accessed July 10, 2025).

25.    The Mattresses are sold through their website, nectarsleep.com, and third-party retailers, such as Amazon.com.

26.    However, no matter the model or size, all reasonable consumers, including Plaintiff, purchased the Products for the same purpose: to sleep on.  As discussed herein, all the Products leak (or risk leaking) toxic fiberglass (the Product Defects).  Therefore, Plaintiff and all reasonable consumers were similarly deceived by Defendants' omissions concerning the Defects, and Plaintiff and all reasonable consumers paid a price premium for these products.

**C.    Defendants' Products Contain and Leak Toxic Fiberglass**

27.    Memory foam mattresses, like Defendants', are more flammable than traditional mattresses.  Accordingly, they are required to meet federal flammability standards.

28.    To comply, the Products are covered by a fire-retardant sock or sleeve that must meet Open Flame Resistance Standards in 16 C.F.R. § 1633.  The sleeves in the Products are made from fiberglass, also known as glass fibers.  "Should a fire break out in the bedroom, the sock suffocates the oxygen needed for fuel and the fiberglass melts to keep the insides from catching fire."[3]

29.    However, the glass fibers from the fire-retardant sock routinely seep through the mattress, covering and releasing fiberglass into the surrounding environment causing skin and eye irritation, as well as breathing issues.

30.    The Defects also include the fire-retardant sock not meeting the Open Flame Resistance Standards required by § 1633 because when the fiberglass leaks out, the fiberglass sock loses its fire-retardant properties.

31.    Thus, when the fiberglass seeps out of the Products, it poses two safety issues: (1) the fire-retardant socks loses its fire-retardant capabilities and (2) the

---

[3] Eric Ridenour, *Do Nectar Mattresses Have Fiberglass?*, SLEEPJUNKIE (last updated June 30, 2025), https://www.sleepjunkie.com/do-nectar-mattresses-have-fiberglass/.

fiberglass easily disperses from the Products into the surrounding environment leading to the risk of serious health effects from breathing it in and a costly clean up inside the home.

**D.    Defendants Encouraged Consumers To Remove The Covers Of Their Mattresses Despite Exposing Them To Fiberglass**

32.    Defendants misleadingly claim their Products are "[t]rusted by 5.5 [m]illion American [s]leepers."  However, the inclusion of fiberglass, which disperses easily throughout the home through ordinary use, renders the Products entirely untrustworthy due to the defect and safety hazard.



[SPACE INTENTIONALLY LEFT BLANK]

33.   In fact, Defendants' track record regarding fiberglass in the Products is particularly problematic.  In 2019, Defendants denied the use of fiberglass in the Products entirely.[4]  As shown by the screenshot below from an investigative blog post, this turned out to be untrue:

In late 2019, another big brand was coming under scrutiny because of fiberglass leaking from its mattresses. At the time, I was shopping for my daughter's first "big girl" bed. I initially contacted Nectar about fiberglass because I was considering buying a Nectar mattress.

I asked Nectar if any of its memory foam mattresses contained fiberglass. This is what Nectar said:

*"No sir none at all" -Nectar*



---

[4] *Id.*

34.    After consumers began publicly complaining about fiberglass leaking out of the Products Defendants were forced to admit they used fiberglass in the Products.

35.    For example, in mid-2020, one consumer spilled water on her Mattress and took the cover off to air dry, as the Nectar website said that the cover was removeable.[5]  As soon as she did so, her entire apartment was covered in fiberglass that was almost impossible to remove.[6]  Moreover, thinking back on it, she had been suffering from nosebleeds since she purchased the mattress and believes that the fiberglass may have already been leaking from the mattress cover, before she even removed it.[7]  *See* excerpt of the complaint below.

[SPACE INTENTIONALLY LEFT BLANK]

---

[5] TUMBLR, https://thesylversmyth.tumblr.com/post/649634125500809216/hello-i-would-like-to-warn-everyone-of-an.

[6] *Id.*

[7] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Hello! I would like to warn everyone of an experience my roommate and I have just had, in case I can prevent it happening to anyone else. Or, you know, if anyone knows a lawyer who could advise us.

My roommate has a queen size Nectar mattress. Friday night, she spilled some water on the bed and took the cover off to air dry. She unzipped the cover, and a flame retardant sleeve (that we hadn't known was there to begin with) made of woven fiberglass began shedding small fiberglass particles. They were airborne. The whole room and everything in it is contaminated, and there are few surfaces elsewhere in the apartment that don't have at least a little. Nowhere on the mattress' tags or on the Nectar website does it say there is a fiberglass sleeve. In fact, it makes a big deal of how there are five components: top of cover, three layers of foam, bottom of cover. Nothing about the flame retardant sleeve there. The label on the cover doesn't say you can't take it off, just that they suggest you don't. It does not mention fiberglass as a material found in the mattress at all. The website even has a page explaining that you CAN take off the cover and wash it, if you must, just that they suggest you don't. No real reasons given. No mention of fiberglass.

Our apartment is sparkly with fiberglass. We have had to drop money on a HEPA filter vacuum that could safely remove some of it, and on new non-permeable mattress covers to contain the worst of the source. We have had to garbage-bag up almost everything in her room. No amount of runs through the laundry seems to get it all out of clothes, and we have to thoroughly wipe out the washer and dryer drums every load. All her pillows were ruined, the chair in her room, her clothing, some expensive bras, a nice area rug, and I'm sure there will be trouble on the horizon with our landlord regarding the carpet, even if we do vacuum it as well as we can.

Lilly has been having nosebleeds, before the mattress was unzipped, but the worst one I've seen yet was the one that evening. She's been sleeping on it almost a year, and it could have begun coming through the fabric cover. Nosebleeds are a sign of fiberglass inhalation.

We have contacted the company, and their response was honestly insulting. We were told that we shouldn't have taken the mattress cover off to begin with, and that it can no longer be covered by the 365 night guarantee, despite us having had it for under the full year. I have just now, after three days trying, finally spoken to someone willing to look into our case, so here's hoping we'll get even a fraction of what we are, frankly, owed.

36.    Indeed, only when prompted by customers did Defendants clarify their previous statement.[8]  Worse, Defendants failed to include any warning on the packaging that fiberglass would leak, or could leak, out of the Mattresses through regular use.  Moreover, Defendants tried to claim that the fiberglass in the Mattresses were ""not the harmful type [of fiberglass] that most think of."[9]  However, there are no non-irritating types of fiberglass.

I contacted Nectar through live chat again and this is what I was told:

*"I apologize for the misinformation. Our Fire retardant is a proprietary sock that contains fiberglass; however, it's not the harmful type that most think of." -Nectar*



---

[8] *Id.  See also* John Snow, *Does Nectar Mattress Have Fiberglass?  Most Likely*, FIBERGLASSFREE.COM (Mar. 01, 2024), https://fiberglassfree.com/fiberglass-checks/does-nectar-still-use-fiberglass/.

[9] Snow, *supra* note 8.

37.    Additionally, as discussed briefly *supra*, Defendants' Products—including Plaintiff's—feature a zippered outer.  When the cover is unzipped, consumers are directly exposed to the interior fiberglass.

38.    Despite Defendants' knowledge of fiberglass in its cover, Defendants encouraged its removal.  Defendants first recommended customers remove the outer cover so that it could be washed when necessary.  Despite this recommendation, they provided no warning about the risk of doing so.[10]

39.    Finally, circa 2022 or 2023, and after many complaints about fiberglass exposure, Defendants added a warning to the outer cover warning consumers against removing the cover for risk of injury or death.[11]  But the warning never specified why.  Specifically, that warning made no mention fiberglass.

40.    By failing to explain the risk that existed, Plaintiff and consumers were never truly appraised of the harm that can arise by removing the cover for cleaning.  Remarkably,  Defendants added this disclaimer to the outer cover and continued to manufacture the outer cover **with a zipper** that made the cover removeable.  This minimized the effect of any possible warning.

### E.    Regardless Of Any Disclaimer Or Zipper, The Mattresses Leak Fiberglass

41.    Disclaimer aside, even if consumers did not remove the outer cover, the covers leaked the fiberglass into their homes.  Defendants failed to mention their Products pose this risk to Plaintiff and those similarly situated regardless of whether the cover is removable.

42.    Even a small leak can introduce thousands of glass fibers into their homes.[12]

---

[10] *Id.*

[11] *Id.*

[12] *See generally*, Harrison Wall, *How to Clean Fiberglass from a Mattress*, (last updated June 30, 2025) SLEEPJUNKIE, https://www.sleepjunkie.com/how-to-clean-fiberglass-from-a-mattress/.

43.    However, in October 2023, Defendants followed the industry trend and disavowed the use of fiberglass in the Products.[13]  Interestingly, Defendants refused to provide any proof of this change at the time.[14]

44.    For example, one version Defendants sell under the Nectar Classic brand on Amazon.com[15] has invited scores of complaints from consumers.

45.    Multiple verified Amazon purchasers gave the Nectar Classic Mattress a one-star rating because the mattress exposed them and their homes to toxic fiberglass.

46.    As one verified purchaser stated, as recently as April 29, 2025:

> I purchased this mattress in November 2024, and by April 2025, the zipper came undone, exposing potential fiberglass, which is a health risk.  Despite providing my order details and photos multiple times, Nectar support has been unresponsive and repetitive, asking for the same information with no resolution.
>
> I do not recommend this product or company due to the safety concerns and lack of proper support.

47.    A verified purchaser authored a review on October 5, 2022, that states, in part: "Unboxing process is very time-consuming and stressful because if you cut too deep the fiberglass in the mattress will spread throughout the house and potentially murder you."

48.    A verified purchaser authored a review on December 29, 2024, that reads: "Don't buy this garbage.  It's full of fiberglass."

_____

[13] *Id.*

[14] Snow, *supra* note 8.

[15] *Nectar Classic 12" Queen Mattress*, AMAZON, https://www.amazon.com/Nectar-Classic-Queen-Mattress-Version/dp/B0DCXFXGBM/ref=cm_cr_arp_d_bdcrb_top?ie=UTF8&th=1 (last accessed July 01, 2025).

49.    A purchaser authored a review on April 7, 2022, that reads: "The first 3-5 weeks wasn't that bad after that couldn't get comfortable then the whole fiberglass situation after 4-5 months started noticing wheezing and itchiness."

50.    A purchaser authored a review on December 6, 2024, that states, in part: "you're not allowed to remove the cover (early on, it was advertised as washable. Later, when fiberglass was revealed to be in the cushioning, they changed this to you can never remove it.)"

51.    A purchaser authored a review on April 30, 2021, that states:

> I bought a Nectar mattress from Nectar's website. I recently spilled a glass of water on the mattress and I removed the cover to air dry.  The tag on the mattress cover by the zipper recommends spot cleaning only, but doesn't warn against removing the cover entirely.  I assumed spot clean only just meant not to put it in in the laundry, as stated on the tag.  In addition to no explicit warnings on the tag, Nectar's website clearly states that you can launder the cover if needed and that they only recommend against removing it & advise against touching bare mattress because it may damage mattress integrity. What they don't mention anywhere on the website or tags is that the reason for their suggestions is the flame retardant fiberglass sock under the cover.  Because they do not have a single mention of this fiberglass sock's presence, I had bought the mattress with the understanding that the mattress was as it is depicted in many diagrams on the website: a top and bottom zip-on cover with three layers of foam inside, and nothing else.  However, that was a false depiction, and once the mattress cover was taken off, the fiberglass was exposed.  Since it is such fine particles, the act of taking off the cover disturbed it and made large amounts of the fiberglass airborne.  My roommate & I are now living in a space contaminated with fiberglass, without a viable mattress, with a plethora of ruined clothing and belongings that will need replacing, and we are also stuck footing the likely hefty cleaning bill. What's more, I've been getting frequent heavy nosebleeds, possibly a result of fiberglass inhalation while using and/or

handling the mattress. This never would have happened if Nectar had been upfront about the materials used in their mattress, or if they had placed clear warning labels on the mattress cover tags. They even went so far as to tell me that I couldn't get a refund because I had voided my warranty through misuse of a mattress that I had never been informed was misuse, and had been told by the website was ok to do, though it had a chance of damaging the mattress' "integrity" if I touched the uncovered mattress too much. I had just thought that was something about skin oils and memory foam. There was no indication anywhere that I was doing something wrong, and when it literally exploded in my face, they had the nerve to tell me that it was my fault and now they couldn't refund my money, much less right any of the many other wrongs that occurred here. And now I have damaged property, what seems like an injury from fiberglass inhalation, an unusable mattress, and a lot of bills to pay.

Suffice it to say we will be filing a lawsuit.

52. A purchaser authored a review on December 19, 2022, that reads:

I was super concerned when I was constantly getting sick after using this mattress but I correlated it with the fact that I had moved states and I was just adjusting to the weather or something but after almost a year I found out that they use fiberglass in their mattress and I've been waking up with hives on my face, headaches, and rashes all over my body. I seriously hope that people read this review and stay as far away from this mattress as possible. I had assumed that in me spending $800 on a mattress I would receive something of quality but instead I was unknowingly cuddling with death every night. 1/10 would not recommend.

53. A purchaser authored a review on June 1, 2021, that reads:

These things have an outrageously dangerous fiberglass sleeve under the outer cover. They say it's safe as long as you don't remove the outer cover, but after two/three years of regular use the fiberglass is

now leaking out of the mattress.  Insulting reaction from
Nectar.  I don't expect these things to be on the market
forever.

54.     A purchaser authored a review on March 16, 2023, that reads:

The bed sags in the middle after a year and it
has fiberglass in it that leaks out and makes you sick and
customer service is no help they blow you off do yourself a
favor don't buy you will be sorry

55.     On information and belief, Defendants' Nectar Classic Mattress is not
the only model with these defects but every single Nectar mattress at some point had
the Defects.

**F.      The Presence (or Risk) of Fiberglass in the Products
Far Exceeds Expectations of Reasonable Consumers**

56.      As discussed *supra,* the packaging and information provided to
Plaintiff and similarly situated consumers fails to warn customers that the Products
pose a risk to health and safety.

57.     Given the negative effects of toxic fiberglass on a consumers' health,
the possibility for this substance to leak out of a consumers' bedding is a material
fact to reasonable consumers, including Plaintiff and members of the Classes.

58.     As demonstrated below, Defendants know that the safety of their
Products is a material fact to reasonable consumers.

59.     However, Defendants also knew that if the presence, or risk, of toxic
fiberglass in its Products was disclosed to Plaintiff and the Class members, then
Plaintiff and the Class members would be unwilling to purchase the Products or
would pay less for them.

60.     In light of Defendants' knowledge that Plaintiff and the Class Members
would be unwilling to purchase the Products or would pay less for the Products if
they knew they leaked (or risked leaking) toxic fiberglass.

61.    Defendants knew, or should have known, that Plaintiff and Class members would rely upon the packaging of the Products and intend for them to do so but failed to disclose the likelihood of toxic fiberglass leaking out of the Products.

62.    Indeed consumer concern for fiberglass free Mattresses has been growing.  For example, the Environmental Working Group's vice president of government affairs in California, Bill Allayud, said "Californians are demanding healthier and safer alternatives to the toxic materials currently in some mattresses and sofas. Consumers increasingly want to know they're not being unintentionally exposed to health hazards in their everyday life."[16]

63.    Similarly, during an April 2023 California legislative committee hearing, Assemblymember Laura Friedman said "when individuals unzip or open mattress covers, unintentional exposure to fiberglass can occur.  In addition, there's concern that even when the mattress or couch covers are not disturbed, the fiberglass particles escape to the surface, leading to unintended exposures."[17]

64.    Defendants knew, or should have known, that they owed consumers a duty of care to adequately disclose the likelihood, or possibility, that toxic fiberglass would leak out of the Products.

65.    Additionally, Defendants knew, or should have known, that a reasonable consumer would utilize the Products for long periods of time each day, leading to significant wear and tear on the Products and increasing the likelihood for exposure to fiberglass.

66.    For example, in the AB 1059 legislative hearing, Bill Allayud also said "fiberglass is a true concern about exposure to everyone, not just children in this

---

[16] Aimee Dewing, *California Legislature Approves Ban on Fiberglass in Mattresses and Upholstered Furniture*, EWG (Sept. 11, 2023), https://www.ewg.org/news-insights/news-release/2023/09/california-senate-approves-ban-fiberglass-mattresses-and?utm_source=chatgpt.com.

[17] Assemblywoman Laura Friedman, Assembly Standing Comm. on Environmental Safety & Toxic Materials, Apr. 18, 2023 Hearing on AB 1059 (remarks at 30:23).

case. We're often worried about children in this Committee. Through wear and tear, people opening up mattresses to wash them or look what's inside, they get spread quite easily and they're microscopic fibers, can get in the lungs and have bad health impacts. We understand the need for safety. No one wants to see a mattress go up in flames. It's not just in your house."[18]

67. Defendants knew, or should have known, they could control the possibility of fiberglass leaking out of the Products by properly enclosing the fiberglass in a durable enclosure that would not leak, or risk leaking, out of the Products through normal use; or by eliminating the use of fiberglass in the Products in its entirety.

68. Prior to purchasing the Products, Plaintiff and the Class Members were exposed to, saw, read, and understood Defendants' labels, and relied upon them in purchasing the Products, but Defendants failed to disclose the likelihood, or possibility, that fiberglass would leak out of the Products through regular use.

69. As a result, of Defendants' concealment that the Products leaked, or risked leaking, toxic fiberglass, Plaintiff and the class members reasonably believed that Defendants' Products would not detrimentally affect their own health.

70. In reliance upon Defendants' labels that contained omissions, Plaintiff and the Class Members purchased the Products.

71. Had Plaintiff and the Class Members known the truth—*i.e.*, that the Products leaked (or risked leaking) toxic fiberglass, rendering them unsafe for use—they would not have been willing to purchase them or would have paid less for them.

72. Therefore, as a direct and proximate result of Defendants' omissions concerning the Products, Plaintiff and the Class Members purchased the Products.

73. Plaintiff and the Class Members were harmed in the form of the monies they paid for the Products which they would not otherwise have paid had they known

---

[18] Bill Allayaud, Assembly Standing Comm. on Environmental Safety & Toxic Materials, Apr. 18, 2023 Hearing on AB 1059 (remarks at 32:29).

the truth about the Products.  Since the likelihood for leakage (or risk) of toxic fiberglass renders the Products unsafe for use, the Products that Plaintiff and the Class Members purchased are worthless or are worth less than Plaintiff and the Classes paid for them.  As such, the Products carry a price premium on account of the fiberglass defect.

74.    Based on Defendants' decision to tout the Products as trustworthy, as well as the fact that the possibility of leakage of fiberglass pertains to matters of safety, Defendants had a duty to tell the full truth about the likelihood or leakage of fiberglass from regular use of the Products.

75.    The Products' labels are materially deceptive, false, and misleading given Defendants' omission about the likelihood, or risk, that fiberglass would leak from the mattresses and expose consumers of the Products.

76.    Because of these risks, Defendants had a duty to disclose the presence of fiberglass and the risk posed.  Indeed, because, just by laying on the mattress or removing the cover to wash it, the risk from fiberglass exposure in the cover poses an unreasonable safety hazard.  Additionally, because the risk arises by merely using the mattresses as intended (laying on it and washing it), which cause the fiberglass to either seep through the cover or be exposed through removal, the defect is material to the central function of the Product.  Indeed, a mattress—designed for sleeping on— cannot function as such if sleeping on it causes the defect to arise.

77.    Moreover, because Defendant—as manufacturer—was made aware of the defect, it has superior knowledge of the defect but failed to properly remedy it; instead continued to sell the Products with fiberglass.

### FED R. CIV. P. 9(B) ALLEGATIONS

78.    Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  To the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) by establishing

the following elements with sufficient particularity.

79.    **WHO**: Defendants made material omissions of fact on their packaging of the Products by omitting the likelihood (or risk) of leakage of fiberglass through regular use of the Products.

80.    **WHAT**: Defendants' conduct was and continues to be fraudulent and deceptive because it has the effect of deceiving consumers into believing that the Products do not leak (or risk leaking) fiberglass.  Defendants omitted from Plaintiff and Class Members that the Products leak (or risk leaking) fiberglass.  Defendants knew or should have known this information is material to all reasonable consumers and impacts consumers' purchasing decisions.  Yet, Defendants have omitted from the Products' labeling the fact that they leak (or risk leaking) fiberglass.

81.    **WHEN**: Defendants omitted from the Products' labeling the fact that the Products leak (or risk leaking) fiberglass, at various times throughout the applicable relevant periods, including at the point of sale, the exact dates of which may be determined through discovery.

82.    **WHERE**: Defendants' omissions were made on the front labeling and packaging of the Products and were thus viewed by every purchaser, including Plaintiff, at the point of sale in every transaction.  The Products are sold in brick-and-mortar stores and online stores nationwide.

83.    **HOW**: Defendants omitted from the Products' labeling the fact that they leak (or risk leaking) fiberglass.  And as discussed in detail throughout this Complaint, Plaintiff and Class Members read and relied on Defendants' front-label omissions before purchasing the Products.

84.    **WHY**: Defendants omitted from the Products' labeling the fact that they leak (or risk leaking) fiberglass for the express purpose of inducing Plaintiff and Class Members to purchase the Products at a substantial price premium or more than they would have paid had they known the truth about the Products.  As such, Defendants profited by selling the Products to at least thousands of consumers

throughout the nation, including Plaintiff and the Class Members.

## CLASS ALLEGATIONS

85.    Plaintiff brings this action individually and on behalf of all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23.  The class definition(s) may depend on the information obtained throughout discovery. Notwithstanding, at this time, Plaintiff brings this action and seeks certification of the following proposed classes:

**Nationwide Class:** All persons within the United States who purchased the Products from the beginning of any applicable statute of limitations period through the date of judgment.

**Multistate Class**: All persons in California, Delaware, the District of Columbia, Kansas, New Jersey, Ohio, Utah, Missouri, West Virginia, and Virginia, who purchased the Products from the beginning of any applicable limitations period through the date of judgment.

**California Subclass**: All persons who purchased the Products in the State of California from the beginning of any applicable limitations period through the date of judgment. [The Nationwide Class, Multistate Class, and California Subclass are collectively referred to as the "Classes."]

86.    Excluded from the proposed Classes are the Defendants, and any entities in which Defendants have a controlling interest, Defendants' agents, employees and their legal representatives, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, and all resellers of the Products.

87.    Plaintiff reserves the right to amend the definition of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

88.    **Numerosity.**  At this time, Plaintiff does not know the exact number of members of the Classes; however, given the nature of the claims and the number of retail stores in the United States selling the Products, Plaintiff believe that the Class

Members are so numerous that joinder of all members is impracticable. While the exact number of Class Members remains unknown at this time, upon information and belief, there are thousands, if not hundreds of thousands, of putative Class Members. Moreover, the number of members of the Classes may be ascertained from Defendants' books and records. Class Members may be notified of the pendency of this action by mail and/or electronic mail or other appropriate digital means, which can be supplemented if deemed necessary or appropriate by the Court with published notice.

89. **Predominance of Common Questions of Law and Fact.** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual Class Members include:

a. whether the Products leak, or risk leaking, fiberglass;

b. whether Defendants' conduct is unethical, oppressive, unscrupulous, and/or substantially injurious to consumers;

c. whether leakage of fiberglass from the Products is material to a reasonable consumer;

d. whether Defendants had a duty to disclose that their Products leaked, or risked leaking, fiberglass;

e. whether Plaintiff and members of the Classes are entitled to injunctive and other equitable relief;

f. whether Defendants failed to disclose material facts concerning the Products;

g. whether Defendants' conduct was unfair and/or deceptive;

h. whether Defendants have been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendants to retain the benefits conferred upon Defendants by Plaintiff and the Class Members;

i. whether Defendants' conduct was deceptive under the statutes asserted herein; and

j.  whether Plaintiff and the Class Members have sustained damages with respect to the common-law claims asserted, and if so, the proper measure of their damages.

90.  **Typicality.**  Plaintiff's claims are typical of those of the Class members because Plaintiff, like other Class members, purchased, in a typical consumer setting, the Products and Plaintiff sustained damages from Defendants' wrongful conduct.

91.  **Adequacy.**  Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel that is experienced in litigating complex class actions.  Plaintiff has no interests which conflict with those of the Classes.

92.  **Superiority.**  The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the members of the Classes. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

## COUNT I
### Violation of California's Unfair Competition Law ("UCL")
### California Business & Professions Code § 17200, *et seq.*
### (On behalf of Plaintiff and the California Subclass)

93.  Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

94.    Plaintiff brings this claim individually and on behalf of the California Subclass against Defendants.

95.    Defendants violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, by engaging in unfair, fraudulent, and unlawful business practices.

96.    Plaintiff has standing to pursue this claim because he suffered an injury-in-fact and lost money or property because of Defendants' unlawful, unfair, and fraudulent conduct.  Specifically, Plaintiff purchased his Product for his own personal use.  In doing so, Plaintiff relied upon Defendants' omissions and reasonably understood that the Mattress was safe to sleep on and posed no risk to his health and his home.  Plaintiff spent money in the transaction that he otherwise would not have spent had he known the truth about Defendants' advertising claims.

97.    Because Defendants' conduct is ongoing, Plaintiff seeks an order enjoining Defendants from continuing to conduct business through their fraudulent conduct and further seeks an order requiring Defendants to conduct a corrective advertising campaign in accordance with California Business & Professions Code §17203.

98.    As a result of Defendants' conduct, Plaintiff seeks restitution, disgorgement, and injunctive relief under California Business & Professions Code §17203.

99.    Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from his purchase of his Product is determined to be an amount less than the premium price of the Product. Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which he is entitled.

100.    Injunctive relief is also appropriate, and indeed necessary, to require Defendants to provide full and accurate disclosures regarding the Products so that Plaintiff and Class Members can reasonably rely on Defendants' packaging as well

as those of Defendants' competitors who may then have an incentive to follow Defendants' deceptive practices, further misleading consumers.

101.   Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosures of the likelihood, or risk, that fiberglass will leak from the Products; or (2) the removal of such fiberglass from the Products, will ensure that Plaintiff is in the same place he would have been in had Defendants' wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at his disposal.

### *"Unfair" Prong of the UCL*

102.   A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.  That unfairness is determined by weighing the reasons, justifications, and motives for the business act or practice against the gravity of the harm alleged.

103.   Defendants' conduct constitutes an "unfair" business practice because, as alleged herein, Defendants engaged, and continues to engage in, false, misleading, and deceptive advertising campaigns.  Plaintiff and Class Members purchased the Products based on Defendants' labels, which omitted the likelihood (or risk) of toxic fiberglass leaking from the Products.  Plaintiff would not have purchased his Product at all or would have paid less for it but for Defendants failing to disclose that the Products leak (or risk leaking) toxic fiberglass.  Plaintiff and the California Subclass members paid money for the Products.  However, Plaintiff and the California Subclass members did not obtain the full value or any value of the Products due to Defendants' omissions regarding the nature of said Products.  Accordingly, Plaintiff and the California Subclass members suffered an injury in fact and lost money or property as a direct result of Defendants' material omissions.

104.   Moreover, Defendants have engaged, and continue to engage, in conduct that violates the legislatively declared policies of: (1) California Civil Code §§ 1572, 1573, 1709, 1710, 1711 against committing fraud and deceit; and (2) California Civil Code §1750 against committing acts and practices intended to deceive consumers regarding the representation of goods in certain particulars. Defendants gained an unfair advantage over their competitors, whose labeling, advertising, and marketing for other similar products must comply with these laws.

105.   Defendants' conduct, as alleged above and herein, was not motivated by any legitimate business or economic need or rationale, other than to maximize their revenue at the expense of consumers who purchased the Products.  No legitimate reasons, justifications, or motives outweigh the harm and adverse impact of Defendants' conduct on members of the general consuming public.  Defendants engaged, and continue to engage, in such conduct solely to wrongfully extract monies from reasonable consumers to which Defendants are not entitled. Defendants could have, but have not, used alternative means of effecting their legitimate business needs, such as by properly disclosing the likelihood that fiberglass can leak from the Products through regular use, or by omitting the fiberglass entirely.

106.   Defendants' conduct harms consumers and hurts market competition. Defendants' conduct, as alleged herein, is immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and Members of the California Subclass because it violates consumers' reasonable expectations.  If Defendants had advertised the Products in a non-misleading fashion, Plaintiff and other California Subclass Members could have considered other options for purchasing a mattress.

***"Fraudulent" Prong of the UCL***

107.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

108.    Defendants have engaged in, and continue to engage, in, fraudulent business practices by knowingly omitting from consumers that the Products they purchase will leak, or risk leaking, toxic fiberglass.  Defendants' conduct deceived Plaintiff and California Subclass Members who purchased the Products in reliance on Defendants' omissions and is highly likely to deceive members of the consuming public because, as alleged above, the Products violate consumers' reasonable expectations.  Such a business practice lacks utility and functions only to maximize Defendants' profits at the expense of their customers.  The gravity of the harm to Plaintiff and other California Subclass Members, who lost money or property by paying for the Products, far outweighs the benefit to Defendants' conduct.

109.    Further, Defendants' fraudulent business practices will continue to mislead consumers because it will be impossible for consumers to know whether Defendants have stopped misrepresenting the safety of the Products as they concern fiberglass.  Accordingly, the risk of harm to Plaintiff, members of the California Subclass, and the consuming public, is ongoing.

### *"Unlawful" Prong of the UCL*

110.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

111.    Defendants' business practices as alleged herein constitute violations of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* (the "CLRA").  Specifically, Defendants have unlawfully marketed and advertised their Products in violation of Cal. Civ. Code §§ 1770(a)(5), 1770(a)(7), and 1770(a)(9), as detailed above.

112.    Defendants' business practices also constitute violations of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et. seq.* (the "FAL"), as described below.

113.    Defendants' unfair, fraudulent, and unlawful business practices, as enumerated and explained above and below, were the direct and proximate cause of

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                              27

financial injury to Plaintiff and other members of the California Subclass. Defendants have unjustly benefited as a result of their wrongful conduct. Accordingly, Plaintiff and the California Subclass seek an order of this Court that includes, but is not limited to, requiring Defendants to: (a) provide restitution to Plaintiff and the California Subclass; (b) disgorge all revenues obtained as a result of its violations of the UCL; (c); and pay attorneys' fees and costs for Plaintiff and the California Subclass.

**COUNT II**
**Violation of California's False Advertising Law ("FAL")**
**California Business & Professions Code § 17500, *et seq.***
**(On behalf of Plaintiff and the California Subclass)**

114.   Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully stated herein.

115.   Plaintiff brings this claim individually and on behalf of California Subclass.

116.   California's False Advertising Law prohibits any statement in connection with the sale of goods "which is untrue or misleading."  Cal. Bus. & Prof. Code § 17500.

117.   As set forth herein, the Plaintiff purchased his Product based on Defendants' labels, which constituted advertising and which omitted the likelihood (or risk) of toxic fiberglass leaking from the Products.

118.   Plaintiff would not have purchased his Product at all or would have paid less for it but for Defendants failure to disclose that the Products leaked (or risked leaking) toxic fiberglass.

119.   Plaintiff and the California Subclass paid money for the Products. However, they did not obtain the full value or any value of the Products due to Defendants' omissions regarding the nature of the Products.  Accordingly, Plaintiff and the California Subclass members suffered an injury in fact and lost money or property as a direct result of Defendants' omissions.

120.   Defendants' conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff's desire to purchase these Products in the future and hope to rely on Defendants' marketing and packaging.

121.   Plaintiff and members of the California Subclass are entitled to injunctive and equitable relief, and restitution in the amount they spent on the Products.

122.   Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from his purchase of his Product is determined to be an amount less than the premium price of the Product. Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which he is entitled.

123.   Injunctive relief is also appropriate, and indeed necessary, to require Defendants to provide full and accurate disclosures regarding the Products so that Plaintiff and Class Members can reasonably rely on Defendants' packaging as well as those of Defendants' competitors who may then have an incentive to follow Defendants' deceptive practices, further misleading consumers.

124.   Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosures of the likelihood that the Products leak, or risk leaking, fiberglass; or (2) the removal of such fiberglass from the Products, will ensure that Plaintiff is in the same place he would have been in had Defendants' wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at his disposal.

**COUNT III**
**Violation of California's Consumer Legal Remedies Act ("CLRA")**
**California Civil Code § 1750, *et seq.***
**(On behalf of Plaintiff and the California Subclass)**

125.   Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully stated herein.

126.   Plaintiff brings this claim individually and on behalf of the California Subclass.

127.   Plaintiff purchased his Product for household use.

128.   The acts and practices of Defendants as described above were intended to deceive Plaintiff and the California Subclass members as described herein, and have resulted, and will result, in damages to Plaintiff and members of the California Subclass.  These actions violated, and continue to violate, the California Consumers Legal Remedies Act ("CLRA") in at least the following respects:

a.   In violation of California Civil Code §1770(a)(5) of the CLRA, Defendants' acts and practices constitute omissions that the Products have characteristics, uses, and/or benefits, which they do not;

b.   in violation of California Civil Code §1770(a)(7) of the CLRA, Defendants' acts and practices constitute omissions that the Products are of a particular quality, which they are not; and

c.   in violation of California Civil Code §1770(a)(9) of the CLRA, Defendants' acts and practices constitute the advertisement of the goods in question without the intent to sell them as advertised.

129.   By committing the acts alleged above, Defendants have violated the CLRA.

130.   Plaintiff and the California Subclass members suffered injuries caused by Defendants' omissions because they were induced to purchase the Products they

would not have otherwise purchased or would have paid less for if they had known that they leak (or risked leaking) toxic fiberglass.

131.   In compliance with the provisions of California Civil Code §1782, Plaintiff's counsel sent written notice to Defendants on May 20, 2025, informing Defendants of his intention to seek damages under California Civil Code §1750, *et seq*.  The letter stated that it was sent on behalf of all other persons similarly situated.  Accordingly, Plaintiff seeks damages from Defendants for their violations of the CLRA.  Defendants have failed to respond to or remedy the issues raised in the notice letter regarding the Products.

132.   Plaintiff and the California Subclass members are also entitled to, pursuant to California Civil Code §1780, an order enjoining the above-described wrongful acts and practices of Defendants, and any other relief deemed appropriate and proper by the Court under California Civil Code §1780.

133.   Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from his purchase of the Product is determined to be an amount less than the premium price of the Product. Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which he is entitled.

134.   Injunctive relief is also appropriate, and indeed necessary, to require Defendants to provide full and accurate disclosures regarding the Products so that Plaintiff and Class members can reasonably rely on Defendants' packaging  as well as those of Defendants' competitors who may then have an incentive to follow Defendants' deceptive practices, further misleading consumers.

135.   Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosures of the likelihood that fiberglass leaks from the Products; or (2) the removal of such fiberglass from the Products, will ensure that Plaintiff is in the same place he would

have been in had Defendants' wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at his disposal.

### COUNT IV
### Fraud
### (On behalf of Plaintiff, the Nationwide Class, and the California Subclass)

136.   Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully stated herein.

137.   Plaintiff brings this claim under the laws of the State of California.

138.   Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class and the California Subclass against Defendants.

139.   Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  To the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity:

140.   **WHO**: Defendants made material omissions of fact on their packaging of the Products by omitting the likelihood (or risk) of leakage of fiberglass through regular use of the Products.

141.   **WHAT**: Defendants' conduct was and continues to be fraudulent and deceptive because it has the effect of deceiving consumers into believing that the Products do not leak (or risk leaking) fiberglass.  Defendants omitted from Plaintiff and Class Members that the Products leak (or risk leaking) fiberglass.  Defendants knew or should have known this information is material to all reasonable consumers and impacts consumers' purchasing decisions. Yet, Defendants have omitted from the Products' labeling the fact that they leak (or risk leaking) fiberglass.

142.   **WHEN**: Defendants omitted from the Products' labeling the fact that the Products leak (or risk leaking) fiberglass, at various times throughout the

applicable relevant periods, including at the point of sale, the exact dates of which may be determined through discovery.

143.   **WHERE**: Defendants' omissions were made on the front labeling and packaging of the Products and were thus viewed by every purchaser, including Plaintiff, at the point of sale in every transaction.  The Products are sold in brick-and-mortar stores and online stores nationwide.

144.   **HOW**: Defendants omitted from the Products' labeling the fact that they leak (or risk leaking) fiberglass.  And as discussed in detail throughout this Complaint, Plaintiff and Class Members read and relied on Defendants' front-label omissions before purchasing the Products.

145.   **WHY**: Defendants omitted from the Products' labeling the fact that they leak (or risk leaking) fiberglass for the express purpose of inducing Plaintiff and Class Members to purchase the Products at a substantial price premium or more than they would have paid had they known the truth about the Products.  As such, Defendants profited by selling the Products to at least thousands of consumers throughout the nation, including Plaintiff and the Class Members.

146.   As alleged herein, Defendants made these material omissions in order to induce Plaintiff and Class Members to purchase the Products.

147.   As alleged in detail herein, Defendants knew the omissions regarding the Products were false and misleading but nevertheless made such omissions on the Products' labeling.  In reliance on these omissions, Plaintiff and Class Members were induced to, and did, pay monies to purchase the Products.

148.   Had Plaintiff and the Class Members known the truth about the Products, they would not have purchased them or would have paid less for them.

149.   As a proximate result of the fraudulent conduct of Defendants, Plaintiff and Class Members paid monies to Defendants to which Defendants are not entitled, and have been damaged in an amount to be proven at trial.

## COUNT V
## Unjust Enrichment
### (On behalf of Plaintiff, the Nationwide Class, and the California Subclass)

150.   Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully stated herein.

151.   Plaintiff brings this claim under the laws of the State of California.

152.   Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class and the California Subclass against Defendants either together or in the alternative to the legal claims asserted above.

153.   Plaintiff and the Class Members conferred a benefit on Defendants in the form of the gross revenues Defendants derived from the money they paid to Defendants.

154.   Defendants had an appreciation or knowledge of the benefit conferred on it by Plaintiff and the Class Members.

155.   Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff and the Class Members' purchases of the Products, which retention of such revenues under these circumstances is unjust and inequitable because Defendants omitted that the Products leak (or risked leaking) toxic fiberglass.  This caused injuries to Plaintiff and members of the Classes because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known.

156.   Defendants accepted and retained the benefit in the amount of the gross revenues they derived from sales of the Products to Plaintiff and the Class Members.

157.   Defendants have thereby profited by retaining the benefit under circumstances which would make it unjust for Defendants to retain the benefit.

158.   Plaintiff and the Class Members are, therefore, entitled to restitution in the form of the revenues derived from Defendants' sale of the Products.

159.   As a direct and proximate result of Defendants' actions, Plaintiff and Class Members have suffered in an amount to be proven at trial.

160.   Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from his purchase of the Product is determined to be an amount less than the premium price of the Product. Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which he is entitled.

161.   Injunctive relief is also appropriate, and indeed necessary, to require Defendants to provide full and accurate disclosures regarding the Products so that Plaintiff and Class members can reasonably rely on Defendants' packaging as well as those of Defendants' competitors who may then have an incentive to follow Defendants' deceptive practices, further misleading consumers.

162.   Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price will ensure that Plaintiff is in the same place that he would have been in had Defendants' wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Product absent omissions with the full purchase price at his disposal.

**COUNT VI**
**Breach of Express Warranty**
**(On behalf of Plaintiff, the Multistate Class, and the California Subclass)**

163.   Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

164.   Plaintiff brings this action individually and on behalf of Members of the Multistate Class and California Subclass against Defendants.

165.   Plaintiff brings this claim under the laws of the State of California.

166.   As the designer, manufacturer, marketer, distributor, and/or seller of the Products, Defendants issued an express warranty by manufacturing the Mattresses

with a removeable outer cover when removal of that cover directly exposes consumers to toxic fiberglass.

167.    Defendants' representations were part of the basis of the bargain upon which the goods were offered for sale and purchased by Plaintiff and members of the Classes.

168.    As a direct and proximate result of Defendants' breach, Plaintiff and Members of the Multistate Class and California Subclass were injured because they: (1) paid money for the Mattresses that were not what Defendants represented; (2) were deprived of the benefit of the bargain because the Mattresses they purchased were different than Defendants advertised; and (3) were deprived of the benefit of the bargain because the Mattresses they purchased had less value than Defendants represented.  Had Defendants not breached the express warranty by making the false representations alleged herein, Plaintiff and the Multistate Class and California Subclass Members would not have purchased the Mattresses or would not have paid as much as they did for them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant Plaintiff and all members of the proposed Classes the following relief against Defendants:

a.    That the Court certify the Classes under Rule 23 of the Federal Rules of Civil Procedure and appoint Plaintiff as Class Representative and his attorneys as Class Counsel to represent the members of the Classes;

b.    That the Court declare that Defendants' conduct violates the statutes referenced herein;

c.    That the Court preliminarily and permanently enjoin Defendants from conducting business through the unlawful, unfair, or fraudulent business acts or practices, untrue, and misleading labeling and marketing and other violations of law described in this Complaint;

d.    That the Court order preliminary and injunctive relief requiring Defendants to disclose that the Products leak, or risk leaking, toxic fiberglass;

e.  That the Court order Defendants to implement whatever measures are necessary to remedy the unlawful, unfair, or fraudulent business acts or practices, untrue and misleading advertising, and other violations of law described in this Complaint;

f.  That the Court order Defendants to notify each and every individual who purchased the Products of the pendency of the claims in this action to give such individuals an opportunity to obtain restitution from Defendants;

g.  For an award of compensatory damages, the amount of which is to be determined at trial;

h.  For punitive damages;

i.  That the Court grant Plaintiff's reasonable attorneys' fees and costs of suit pursuant to California Code of Civil Procedure §1021.5, California Civil Code §1780(d), the common fund doctrine, and/or any other appropriate legal theory; and

j.  That the Court grant such other and further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  July 15, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:   /s/ *Neal J. Deckant*
        Neal J. Deckant

Neal J. Deckant (State Bar No. 322946)
Joshua B. Glatt (State Bar No. 354064)
Ryan B. Martin (State Bar No. 359876)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ndeckant@bursor.com
       jglatt@bursor.com
       rmartin@bursor.com

*Attorneys for Plaintiff*

**<u>CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)</u>**

I, Neal J. Deckant, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a Partner at Bursor & Fisher, P.A., counsel of record for Plaintiff Adam Aldrich in this action.  Mr. Aldrich alleges he is a resident of Corona, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Central District of California.

3.      I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California this 15th of July, 2025.

_/s/ Neal J. Deckant_
Neal J. Deckant